

# United States Bankruptcy Court
# for the District of Oregon

**Albert E. Radcliffe, Judge**  405 East Eighth Avenue, Suite 2600  (541) 431-4050
Virginia H. Denney, Judicial Assistant  Eugene, Oregon 97401  FAX: (541) 431-4047
Howard J. Newman, Law Clerk

February 19, 2008

Ms. Karen M. Oakes  Mr. Paul Garrick
6502 South 6th Street  PO Box 467
Klamath Falls, OR 97601  Eugene, OR 97440

Mr. Patrick L. Stevens
Hutchinson, Coss, Coons,
DuPries, Orr & Sherlock, PC
777 High Street, Suite 200
Eugene, OR 97401

RE:  RIACH, Justin Russell; Case No. 07-61645-aer13
 Northwest Community Credit Union's Objection to Confirmation

Counsel:

    This matter comes before the court on Northwest Community Credit Union's (NWCCU) objection to confirmation of Debtor's Justin Riach's (Debtor) Chapter 13 plan. The confirmation hearing was held on August 16, 2007. At the hearing, Debtor and NWCCU requested an opportunity to brief certain issues arising from the Debtor's finance of an automobile through NWCCU. The briefs are in and the matter is now ripe for decision.

    <u>Facts</u>:

    On February 10, 2006, Debtor purchased a 2003 Ford Expedition (Ford) from Lithia Toyota Scion (Lithia) in Medford, Oregon. The parties executed a retail installment sales contract (RISK). Under the RISK, the "cash sale price" of the Ford was $18,200. Debtor made a cash down-payment of $2,222, leaving $15,978 as the unpaid balance of the cash sale price. Lithia also financed other charges, including an optional service contract costing $2,920 and a "lifetime oil" contract costing $399 (both paid by Lithia to a third party, FESCD). In the transaction Debtor traded in a 2006 Toyota Scion valued at $14,800, with $18,568 owed against it to "TMCC" (Toyota Motor Credit Corporation), resulting in "negative equity" of $3,768, which Lithia also financed. The total "amount financed principal balance" was $23,239. Debtor gave Lithia a security interest in the Ford to secure all amounts owed under the RISK. The finance charge on the transaction was $6,563.36, for a total "time balance" of $29,802.36, to be paid at 7.25% APR in 84 monthly payments of $354.79 beginning March 27, 2006. On the same

day the RISK was executed, Lithia assigned it to NWCCU. On or about March 23, 2006, NWCCU was noted on the Ford's title as security interest holder.

Debtor filed his Chapter 13 petition on June 12, 2007. His plan is dated June 11, 2007. In ¶ 2(b)(1) thereof he listed NWCCU as a secured creditor.[1] Under the column labeled "Estimated Total Debt if Paying Debt in Full," he listed $18,794.89, to be paid at 7.25% with payments of $400/mo, with a cross-reference to plan ¶ 13.[2] Plan ¶ 13 provides in pertinent part:

> The allowed secured claim of Northwest Federal Credit Union as set forth in 2(b)(1) shall be paid in full to the extent of the value of the collateral pursuant to Section 506(a) of the Bankruptcy Code. The balance of the claim, if any, shall be treated as unsecured. Northwest Community FCU shall retain its lien. This secured claim shall be "crammed down" pursuant to Section 1325(a)(5)(B) of the Bankruptcy Code and the present value of the secured claim as of the effective date of the plan shall be paid in monthly installments at the discount rate set forth in Paragraph 2(b)(1) . . . (A portion of the contract price (approximately $3768.00) did not relate to the purchase price of the vehicle and the Debtor has made payments since 3/27/06 on the loan, resulting in a balance of approximately $18,794.89 as of 5/1/07. Consequently, the "hanging" paragraph" following 1325(a)(9) does not apply even though the vehicle was purchased within the 910 days prior to filing.).[3]

The plan proposes an approximate 0% dividend to general unsecured creditors.

---

[1] Paragraph 2(b)(1) mistakenly lists NWCCU's collateral as a "2006 Toyota" (the traded-in vehicle), instead of the Ford.

[2] Debtor left blank the column in ¶ 2(b)(1) labeled "Collateral Value if Not Paying in Full."

[3] There is an immediate ambiguity in the plan. While ¶ 13 makes clear NWCCU's secured claim will be crammed down to the Ford's value (without stating what it is), ¶ 2(b)(1) proposes to pay the claim in full. Debtor's position is further muddied by his briefs. In his opening brief, he clarifies that the $18,794.89 figure in ¶ ¶ 2(b)(1) and 13 (to be paid in full) is his computation of the vehicle's purchase price minus the negative equity and minus pre-petition payments applied only to the purchase price. He further states the $18,794.89 figure may not be accurate as he did not have a payment history at the time he filed his plan. He argues the negative equity portion (not included in the $18,794.89) should be treated as general unsecured. This position would seem to advocate a "dual status" recognition, see discussion below. Meanwhile Debtor's reply brief appears to advocate for a traditional cram down of NWCCU's secured claim to the Ford's value, with the balance being general unsecured. See Reply Brief at p.3. In spite of theses ambiguities, I discuss each of these positions below.

On August 27, 2007, NWCCU filed a secured proof of claim for $20,708.53, valuing the Ford at $16,012.00.[4]

Issue:

Are negative equity and the cost of service contracts part of the "purchase money" for purposes of the term "purchase money security interest" (PMSI) in the "hanging paragraph" (**HP**)
of 11 U.S.C. § 1325(a),[5] and if not, to what extent do the hanging paragraph's protections survive when only part of the obligation secured is "purchase money?"[6]

Discussion:

Before the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA),[7] Chapter 13 debtors who wanted to retain personal property collateral could utilize § 1322(b)(2) and propose to bifurcate the secured creditor's claim, with the secured portion reduced to the collateral's value, and the balance being treated as general unsecured. Section § 506(a) in conjunction with § 1325(a)(5)(B) allowed them to do this while paying the secured portion (at an appropriate discount rate) over time through the plan. The balance above the collateral's value would be treated as general unsecured, oftentimes only receiving a small dividend. BAPCPA changed this equation as to certain secured claims by adding the HP after § 1325(a)(9). It provides:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that

---

[4] Despite the Ford's valuation at less than the debt, the claim was filed as fully secured in recognition of NWCCU's asserted rights under the "hanging paragraph" discussed below.

[5] Unless otherwise indicated, all subsequent statutory references are to Title 11 of the United States Code.

[6] The RISK also gave NWCCU a security interest in charges for service contracts returned to it and proceeds of any service contract. The parties have not addressed and as such I have not discussed, the effect of obtaining "additional security" on rights under the HP. See discussions in, In re Johnson, 337 B.R. 269, 272-273 (Bankr. M.D.N.C. 2006); In re Murray, 346 B.R. 237, 240 (Bankr. M.D. Ga. 2006) (Murray I), adhered to on reconsideration, 352 B.R. 340 (Bankr. M.D. Ga. 2006) (Murray II); In re Hayes, 376 B.R. 655, 664-667 (M.D. Tenn. 2007); and, In re Weiser, __ B.R. __, 2007 WL 4570917, *6 (Bankr. W.D. Mo. 2007).

[7] Pub. L. 109-8, April 20, 2005, 119 Stat. 23. Most of BAPCPA's provisions, including the HP were effective for cases filed on or after October 17, 2005.

> debt consists of any other thing of value, if the debt was incurred
> during the 1-year period preceding that filing.

The HP is essentially an anti-bifurcation provision. If a secured creditor fits within its protection, the debtor must pay the creditor's claim in full no matter what the collateral's value, in order to retain collateral. Trejos v. VW Credit, Inc. (In Re Trejos), 374 B.R. 210, 220-221 (9th Cir. BAP 2007) (Trejos II).[8]

When a vehicle is the collateral, five requirement must be met to qualify for the HP's protection:

> 1) The creditor must have a purchase-money security interest;
> 2) The purchase-money security interest must secure the debt that is the subject of the claim;
> 3) That debt must be incurred no more than 910 days before the date of the debtor's filing; 4) The collateral for the debt must be a "motor vehicle;" and
> 5) That motor vehicle must have been acquired for the personal use of the debtor.

In re Johnson, __ B.R. __, 2007 WL 4510288, *2 (Bankr. D. Or. 2007) (citing, Trejos I supra at 264). The parties' main dispute is whether prong #1 has been met.

> "Purchase Money Security Interest":

Because the Bankruptcy Code does not define the term "purchase money security interest," I am to look to state law for the definition. Johnson, supra at 2007 WL 4510288, *3.

The applicable statute is ORS 79.0103, which provides in pertinent part as follows:

> (1) As used in this section:
>
> > (a) "Purchase-money collateral" means goods or
> > software that secures a purchase-money obligation
> > incurred with respect to that collateral; and
>
> > (b) "Purchase-money obligation" means an
> > obligation of an obligor incurred as all or part of the
> > price of the collateral or for value given to enable
> > the debtor to acquire rights in or the use of the
> > collateral if the value is in fact so used.
>
> (2) A security interest in goods is a purchase-money security interest:

---

[8] The HP does not prevent cram-down of the interest rate, monthly payments or other contractual terms. See, In re Henry, 353 B.R. 261, 263 (Bankr. D. Or. 2006) (interest rate); In re Trejos, 352 B.R. 249, 266-267 (Bankr. D. Nev. 2006) (Trejos I), aff'd on other grounds, 374 B.R. 210 (9th Cir. BAP 2007).

Ms Oakes & Messrs. Stevens & Garrick
February 19, 2008
Page-5

>   (a) To the extent that the goods are purchase-money
>   collateral with respect to that security interest.

Thus, a "purchase money security interest" exists to the extent "goods"[9] are "purchase money collateral." "Purchase money collateral" is confined to that which secures a "purchase money obligation." A "purchase money obligation" is an obligation either: 1) incurred as all or part of the "price of the collateral" or, 2) for "value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." Thus, the query becomes whether financing negative equity or the cost of service contracts are either part of the Ford's "price," or "enabled debtor to acquire rights in or the use of" the Ford.

The UCC does not define the term "price." Official Comment 3 to ORS 79.0103 gives some guidance,[10] however it doesn't specifically address negative equity or the cost of service contracts.[11] Given the lack of a UCC definition, the <u>Johnson</u> court looked for guidance to the Oregon statutes concerning retail installment contracts for vehicles. <u>Id.</u> at 2007 WL 4510288, *6-7 (Oregon's Article 9 should be construed <u>in pari materia</u> with ORS 83.510(1) and ORS 83.520(3), especially in light of ORS 79.0201(2)).[12] NWCCU argues "negative equity" is

---

[9] The Ford is a "good" as defined in ORS 79.0102(1)(rr) (defining "goods" with exceptions not relevant here, as "all things that are moveable when a security interest attaches.").

[10] Although the Official Comments lack the force of law, they are instructive, because the legislature took note of them at the time of adoption, because they are consistent with the structure of the UCC . . . and because the purpose of the Official Comments is to promote uniform construction of the UCC.

<u>U.S. National Bank v. Boge</u>, 311 Or. 550, 563, 814 P.2d 1082, 1090 (1991).

[11] Official Comment 3 provides in pertinent part:

>   As used in subsection (a)(2) [ORS 79.0103(1)(b)], the definition of
>   "purchase-money obligation," the "price" of collateral or the "value
>   given to enable" includes obligations for expenses incurred in connection
>   with acquiring rights in the collateral, sales taxes, duties, finance charges,
>   interest, freight charges, costs of storage in transit, demurrage,
>   administrative charges, expenses of collection and enforcement,
>   attorney's fees, and other similar obligations.

It further states:

>   The concept of "purchase-money security interest" requires a <u>close nexus</u>
>   between the acquisition of collateral and the secured obligation. Thus, a
>   security interest does not qualify as a purchase-money security interest if
>   a debtor acquires property on unsecured credit and subsequently creates
>   the security interest to secure the purchase price. (emphasis added).

[12] ORS 79.0201(2) provides:

(continued...)

(continued...)

<div style="text-align:right">(continued...)</div>

included in "price" because "discharge of a security interest" is included as an "other benefit" of the contract under ORS 83.520(3)(d).[13] However, Johnson rejected this argument noting "price" more closely equates to an installment contract's "cash sale price," which the statute distinguishes from "other benefits." Id. at 2007 WL 4510288, *7 (comparing ORS 83.520(3)(a)

---

[12](...continued)
> A transaction subject to this chapter is subject to any applicable rule of law which establishes a different rule for consumers <u>and is also subject to ORS 83.510 to 83.680 on retail installment contracts</u> . . . . (emphasis added).

[13] ORS 83.520(3) lists the items which must be disclosed and tallied in a vehicle installment sales contract. It provides:

> The contract shall contain the following items:
> (a) The cash sale price of the motor vehicle which is the subject matter of the retail installment sale.
>
> (b) The amount of the buyer's down payment, itemizing the amounts, if any, paid or credited in money or in goods and containing a brief description of the goods traded in.
>
> (c) The difference between the items set forth in paragraphs (a) and (b) of this subsection.
>
> (d) The amount, if any, included for insurance and other benefits, specifying the coverages and benefits. <u>For purposes of this paragraph, "other benefits" includes any amounts actually paid or to be paid by the motor vehicle dealer pursuant to an agreement with the buyer to discharge a security interest, lien or lease interest on property traded in.</u>
>
> (e) The amount, if any, of official fees.
>
> (f) The principal balance, which is the sum of the items set forth in paragraphs (c), (d) and (e) of this subsection.
>
> (g) The amount of the finance charge.
>
> (h) The time balance, which is the sum of the items set forth in paragraphs (f) and (g) of this subsection.
>
> (I) The time sale price.
>
> (j) A plain and concise statement of the amount in dollars of each installment or future payment to be made by the buyer, the number of installments required, and the date or dates at which, or period or periods in which, the installments are due. (emphasis added)

with ORS 83.520(3)(d));[14] see also, ORS 83.510(1) (defining "cash sale price").[15] Likewise, as to ORS 79.0103(1)(b)'s alternative test for "purchase money obligation," financing negative equity is not value given by the creditor "to enable the debtor to acquire rights in or the use of the collateral." Johnson, supra at 2007 WL 4510288, *8-10 (reiterating the basic rationale set out in f.n. 14 supra, and further holding the mere refinance of pre-existing debt "does not create the requisite close nexus between the 'value given' and . . . acquisition of rights in the Vehicle." Id. at 2007 WL 4510288, *10.

On the other hand, "cash sale price" may include "charges for . . . servicing, repairing or improving the vehicle." ORS 83.510(1). This is an indication that these costs are included in the Ford's "price" for purposes of ORS 79.0103(1)(b). In re Spratling, 377 B.R. 941, 945 (Bankr. M.D. Ga. 2007) (applying analogous Georgia statute); In re Sanders, 377 B.R. 836, 850, n.13 (Bankr. W.D. Tex. 2007) (applying analogous Texas statute).[16] Even without resort to retail installment contract laws, the majority of courts have found, and I agree, that financing the cost of service contracts is either part of the motor vehicle's "price" or "enabled the debtor to acquire rights in or use of" the vehicle. See e.g., In re Pajot, 371 B.R. 139, 155 (Bankr. E.D. Va.. 2007) ("close nexus" between service contract and vehicle); In re Macon, 376 B.R. 778, 782-783 (Bankr. D.S.C. 2007) (service contracts add value; they have no value unless incorporated into purchase); In re Murray, 352 B.R. 340, 348 (Bankr. M..D. Ga. 2006) (Murray II) (extended service contract so inextricably linked to the collateral as to be part of the "price"); Weiser, supra at 2007 WL 4570917, *5; but see, In re White, 352 B.R. 633, 639 (Bankr. E.D. La. 2006)

---

[14] Johnson also noted:

> Negative equity is not similar in nature or scope to the other "expenses incurred in connection with acquiring rights in the collateral" contemplated by Official Comment 3. More importantly, . . . the liability for negative equity is not an expense "incurred in connection with acquiring" the Vehicle; it is an antecedent debt.

Id. at 2007 WL 4510288, *6.

[15] ORS 83.510(1) provides:
As used in ORS 83.510 to 83.680 except where the context otherwise requires:

> (1) "Cash sale price" means the price for which the motor vehicle dealer would sell to the buyer, and the buyer would buy from the motor vehicle dealer, the motor vehicle that is covered by the retail installment contract, if the sale were a sale for cash instead of a retail installment sale. The cash sale price may include any taxes, registration, license and other fees and charges for accessories and their installation and for delivering, servicing, repairing or improving the motor vehicle.

[16] It must be noted however that the RISK itself lists these as "charges other than finance charges," as opposed to an element the "cash sale price."

Ms Oakes & Messrs. Stevens & Garrick
February 19, 2008
Page-8

(service contract paid to a third party is a voluntary expense, independent of vehicle, and is thus a separate asset).

### "Dual Status" or "Transformation":

Since the negative equity is not a purchase money obligation, I must decide how to characterize NWCCU's claim. Two rules have developed, "dual status" and "transformation." Dual status allows a security interest to have both the status of a PMSI to the extent the collateral secures unpaid purchase money, and a general security interest to the extent it secures obligations unrelated to the purchase. Johnson, supra at 2007 WL 4510288, *10. The transformation rule deems that any non-purchase money portion transforms the entire debt into non-purchase money, and thus eliminates the "purchase money" aspect of the security interest. Id.[17] In Johnson, the court recently took up this question and held that the dual status rule was more consistent with the HP's purpose. Id. at 2007 WL 4510288, *13.[18] I will follow this result.

### Allocation:

Under the dual status rule, I need to determine the purchase money and non-purchase money components of NWCCU's secured claim. This requires allocating Debtor's pre-petition payments. Not surprisingly, Debtor argues all pre-petition payments should be allocated to the purchase money component. There is no controlling law on this issue.[19] Official Comment 8 to ORS 79.0103 leaves the court to exercise its discretion by applying "established approaches."[20] I will look first to see whether there is an enforceable contractual provision allocating the

---

[17] Oregon law invokes the dual status rule for non-consumer transactions. ORS 79.0103(6). However, no inferences are to be drawn therefrom as to consumer transactions. ORS 70.0103(8).

[18]  However, from the language of the Hanging Paragraph itself and its limited legislative history, it is clear that the Hanging Paragraph was designed to combat a particular perceived abuse by debtors in chapter 13: purchasing a car shortly before a chapter 13 bankruptcy filing and taking advantage of the substantial depreciation that occurs immediately when a new car is driven off the lot to cram down the secured creditor's collateral interest.

Johnson, supra at 2007 WL 4510288, *13.

[19] Again, the UCC provides the rules for non-consumer transactions, ORS 79.0103(5), but again I am to draw no inferences therefrom as to consumer transactions. ORS 79.0103(8).

[20] Official Comment 8 provides:

Under subsection (h)[ORS 79.0103(8)], the limitation of subsection[s] (e)[ORS 79.0103(5)] . . . to transactions other than consumer-goods transactions leaves to the court the determination of the proper rules in consumer-goods transactions. Subsection (h)[ORS 79.01013(8)] also instructs the court not to draw any inference from this limitation as to the proper rules for consumer-goods transactions and leaves the court free to continue to apply established approaches to those transactions.

payments. See, In re Conyers, __ B.R. __, 2007 WL 3244106, *6 (Bankr. M.D.N.C. 2007). Here, the RISK clearly allocates the $2,222 down-payment to the purchase money component. However, as to the monthly payments, it provides no allocation method.[21] As such, and in light of the HP's purposes, the most equitable method is to allocate the monthly payments pro rata between the purchase money and non-purchase money components. Id., Pajot, supra at 162.[22]

      Here, the total principal amount financed was $23,239, with negative equity of $3,768 (16.21%) being the non-purchase money component and the $19,471 balance (83.79%) representing the purchase money component. Using NWCCU's proof of claim, Debtor owed $20,708.53 as of the petition date, representing a $2,530.47 reduction in the original principal. Applying the above percentages, $410.19 of this represents a reduction in the non-purchase money component, and $2,120.28 represents a reduction in the purchase money component, leaving $3,357.81 as the non-purchase money, and $17,350.72 as the purchase money, components as of the petition date.[23] The $17,350.72 would need to be paid in full under the HP. The $3,357.81 would need to be paid as a secured claim only to the extent there is value in the Ford for it to attach to after subtracting from the value the $17,350.72. Id. at 162, n* (assuming total claim exceeds collateral's value, collateral's value is a floor below which the secured claim cannot be decreased.). Here, assuming Debtor does not contest NWCCU's $16,102 valuation in its proof of claim, there is no excess value, so the $3,357.81 would be treated as a general unsecured claim under the plan.[24]

      Conclusion:

      The cost of financing the trade-in's negative equity is not a purchase money obligation under Oregon's Article 9. It is excluded from the HP's protection. In contrast, the cost of financing the service and lifetime oil contracts are purchase money obligations. Under the dual status rule, these costs are protected by the HP. In determining the purchase money component of NWCCU's secured claim, the parties should use the "pro rata" approach as outlined above.

      Confirmation of Debtor's plan dated June 11, 2007 is denied. Debtor has 30 days to file an amended plan consistent with the above. Debtor has the same period to file any objection to NWCCU's proof of claim.

---

[21] The RISK merely provides that payments are to be applied first to interest, then late charges, and the remainder to principal.

[22] Applying the payments solely to the purchase money component would disproportionately erode the claim's purchase money component and thereby run counter to the HP's purpose. On the other hand, applying the payments solely to the non-purchase money component would, in many cases, largely vitiate dual status and create de facto "full protection" for secured vehicle creditors.

[23] I will assume, as the court did in Pajot, supra at 161-162, that any interest and late charge elements of Debtor's monthly payments would also be apportioned pro rata.

[24] My computations are based on the accuracy of the figures in NWCCU's proof of claim. Debtor is at liberty however to object thereto. If an objection is lodged and the claim is ultimately allowed at a lesser amount, my computations will, by necessity, change.

Ms Oakes & Messrs. Stevens & Garrick
February 19, 2008
Page-10

  The above constitute my findings of fact and conclusions of law under FRBP 7052. An order consistent therewith will be entered.

            Very truly yours,

            *albert E. radcliffe*

            ALBERT E. RADCLIFFE
            Bankruptcy Judge

AER:vhd